**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| CARL BENJAMIN "BEN" NETT, )<br><br>    Plaintiff, )<br><br>    v. )<br> )<br>TOWN OF PURCELLVILLE, VA. )<br>    Serve: Robert Sproul, Town Attorney )<br>           Harrison & Johnston, P.C. )<br>           23 N. King St. Second Floor )<br>           Leesburg, VA 20176 )<br> )<br>ERIN RAYNER )<br>Individually and in her official capacity as a )<br>Councilmember for the Town of Purcellville, Va, )<br>    221 S. Nursery Avenue )<br>    Purcellville, VA 20132 )<br> )<br>CALEB STOUGHT )<br>Individually and in his official capacity as a )<br>Councilmember for the Town of Purcellville, Va. )<br>    221 S. Nursery Avenue )<br>    Purcellville, VA 20132 )<br> )<br>KEVIN WRIGHT )<br>Individually and in his official capacity as a )<br>Councilmember for the Town of Purcellville, Va. )<br>    221 S. Nursery Avenue )<br>    Purcellville, VA 20132 )<br> )<br>SARA LOMBRANA )<br>Individually and in her official capacity as )<br>Interim Chief of Police for the Town of Purcellville )<br>    221 S. Nursery Avenue )<br>    Purcellville, VA 20132 )<br> )<br>MICHAEL HOLMAN )<br>Individually and in his official capacity as a )<br>Lieutenant in the Police Department )<br>for the Town of Purcellville, Va. )<br>    221 S. Nursery Avenue )<br>    Purcellville, VA 20132 ) | Case No.: |

1

DIANA HAYS                                              )
Individually and in her official capacity as           )
Acting Town Manager for the Town of Purcellville )
     221 S. Nursery Avenue                              )
     Purcellville, VA 20132                             )
                                                        )
LADONNA SNELLBAKER                                      )
Individually and in her official capacity as           )
Director of Human Resources for the                    )
Town of Purcellville, Va.                               )
     221 S. Nursery Avenue                              )
     Purcellville, VA 20132                             )
                                                        )
       And                                            )
                                                        )
R.D. "BOB" ANDERSON                                     )
Individually and in his official capacity as           )
Commonwealth's Attorney for Loudoun County             )
                                                        )
       Defendants.                                    )
                                                        )

## COMPLAINT

**(Denial of Due Process, Retaliation for Exercise of First Amendment Rights, Violation of Civil Rights Under Color of Law, Breach of Contract, Tortious Interference with Business Expectancy, Statutory and Common Law Conspiracy, Defamation)**

COMES NOW the Plaintiff, CARL BENJAMIN "BEN" NETT ("Nett" or "Plaintiff"), by counsel, and hereby files his Complaint for damages against the defendants, TOWN OF PURCELLVILLE, VA; ERIN RAYNER, individually and in her capacity as Councilmember for the Town of Purcellville, Va.; CALEB STOUGHT; individually and in his capacity as Councilmember for the Town of Purcellville, Va.; KEVIN WRIGHT, individually and in his capacity as Councilmember for the Town of Purcellville, Va.; SARA LOMBRANA, individually and in her official capacity as Interim Chief of Police for the Town of Purcellville, Va.; MICHAEL HOLMAN, individually and in his official capacity as a Lieutenant in the Police Department for the Town of Purcellville, Va.; DIANA HAYS, individually and in her official capacity as Acting Town Manager for the Town of Purcellville, Va.; LADONNA SNELLBAKER, individually and

2

in her official capacity as the Director of Human Resources for the Town of Purcellville, Va.; and R.D. "BOB" ANDERSON, individually and in his official capacity as Commonwealth's Attorney for Loudoun County, Va. (collectively referred to as "Defendants").

In support of his Complaint, Plaintiff states as follows:

## NATURE OF THE CASE

1.    Plaintiff brings this action against Defendants under 42 U.S.C. § 1983, the 14th Amendment to the United States Constitution's Due Process Clause, the First Amendment to the United States Constitution,  and supplemental state law claims arising out of the policies, practices, and conspiracies of Defendants to cause Plaintiff harm due to his expression of political views while a candidate for, and as an official holding, local elective office.

## JURISDICTION AND VENUE

2.    This Court has subject-matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because the Complaint alleges violations under 42 U.S.C. § 1983 and the First and 14th Amendments to the United States Constitution.

3.    This Court has supplemental jurisdiction over Plaintiff's state law and common law claims which arise from the same body of operative facts pursuant to 28 U.S.C. § 1367(a).

4.    This Court has personal jurisdiction over the Defendants because they conduct business in this district and the acts complained of herein occurred within this district.

5.    Venue is proper in this district and in this division by virtue of 28 U.S.C. § 1391(b) because, among other reasons, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES AND OTHER INVOLVED INDIVIDUALS AND ENTITIES

6.    Plaintiff Carl Benjamin "Ben" Nett ("Nett" or "Plaintiff") is a Councilmember for the Town of Purcellville, Va., and for some of the periods relevant to this action was a police officer for the Town of Purcellville, Va.

7.    Defendant Town of Purcellville, Va. ("Purcellville" or the "Town") is a town located within the boundaries of Loudoun County, Va. The Town is a defendant in this action.

8.    Christopher Bertaut ("Bertaut") is the Mayor of Purcellville and was elected as such in November 2024 for a term beginning January 1, 2025. As Mayor, Bertaut serves on the Town Council with voting privileges.

9.    Susan Khalil ("Khalil") is a Councilmember for the Town and was elected as such in November 2024 for a term beginning January 1, 2025.

10.    Carol Luke ("Luke") is a Councilmember for the Town with a term beginning January 1, 2023.

11.    Kevin Wright ("Wright") is a Councilmember for the Town. He was initially appointed to fill a vacancy, effective January 1, 2023, and then won election in November 2024 to fill the remainder of the unexpired term. Wright is a defendant in this action.

12.    Erin Rayner ("Rayner") is a Councilmember for the Town with a term beginning January 1, 2023. Raynor is a defendant in this action.

13.    Caleb Stought ("Stought") is a Councilmember for the Town and was elected as such in November 2024 for a term beginning January 1, 2025. Stought is a defendant in this action.

14.    Sara Lombrana ("Lombrana") was hired as Deputy Chief of Police for the Town in September, 2024, and since January, 2025, has served as Interim Chief of Police. She is a defendant in this action.

4

15.     Michael Holman ("Holman") is a Lieutenant in the Police Department for the Town and was Nett's direct supervisor in Nett's capacity as a police officer for the Town. Holman is a defendant in this action.

16.     Kwasi Fraser ("Fraser") is a former Mayor of Purcellville and was appointed Town Manager during some of the time period relevant to this matter.

17.     Diana Hays ("Hays") is the Assistant Town Manager for the Town and during some periods relevant to this action served as Acting Town Manager. She is a defendant in this action.

18.     LaDonna Snellbaker ("Snellbaker") is the Director of Human Resources for the Town. She is a defendant in this action.

19.     Jessica Tacha ("Tacha") is a Sergeant with the Prince William County Police Department. She conducted the "investigation" of Nett on behalf of Lombrana.

20.     Wright, Rayner, Stought, Lombrana, Holman, Hays, and Snellbaker are sued in both their individual capacities and in their official capacities as officers, officials, and employees of the Town as indicated.

21.     John Cafferky ("Cafferky") is an attorney with the law firm of Blankenship and Keith, P.C., located in Fairfax, Va. He served as Town Attorney for Purcellville during some of the relevant time periods to this action. He resigned as Town Attorney when the Town repeatedly failed to follow his legal advice; its actions made him a potential witness in this action and caused a legal conflict with his continued representation of the Town.

22.     Robert Sproul ("Sproul") is an attorney with the law firm of Harrison & Johnston, with an office in Leesburg, Va. Sproul served as litigation counsel for the Town during a hearing for a grievance filed by Nett and was later appointed Town Attorney. He then recused himself from further involvement in the case.

23.     R.D. "Bob" Anderson ("Anderson") is the Commonwealth's Attorney for Loudoun County, Va., which includes the Town of Purcellville, Va. He is a resident of Purcellville. He is sued in his individual and official capacities.

24.     Eric Olsen ("Olsen") is the Commonwealth's Attorney for Stafford County, Va. At Anderson's request the Loudoun County Circuit Court appointed him as "Special Prosecutor" to serve in Anderson's stead involving certain matters pertaining to Nett.

25.     Tony Sabio ("Sabio") was appointed Interim Town Manager by the Town Council on November 12, 2025.

## FACTUAL BACKGROUND

**The 2024 Election.**

26.     Nett is a former national security careerist with extensive experience serving with and on behalf of the Secret Service, the Central Intelligence Agency ("CIA"), and the Department of Defense.

27.     Nett is a long-established resident of Purcellville.

28.     In 2022, Nett joined the Purcellville Police Department. He graduated first in his class from the Northern Virginia Criminal Justice Training Academy in December 2022. He received the Sheriff's Meritorious Action Award in 2023. He was then named Officer of the Year in 2024.

29.     In 2024, Nett decided to continue his career in public service by running for the Town Council in Purcellville.

30.     Town Council elections in Virginia are nonpartisan, meaning that candidates all run as independents and do not appear on the ballot as members of any political party.

31.    Despite the nonpartisan nature of Town elections, however, it is not unusual for some candidates for Council to run as "teams" or "slates" based on a common set of campaign themes and priorities.

32.    In the 2024 election, Nett, Bertaut, and Khalil ran as a slate for Town Council (Bertaut running for Mayor) and were allied with then-current councilmember Luke.

33.    The Bertaut-Nett-Khalil slate ran on a platform of reforming Town operations. Specifically, they pledged to reduce utility rates, oppose annexations into the Town for commercial and industrial development, and streamline the government.

34.    Part of the platform to "streamline" the government included reforming the operations of the Police Department, to provide better service and reduce costs. Nett and his partners viewed the department as "top-heavy," with too many command staff receiving six-figure salaries but not serving patrol or other operational functions. At the same time, underpaid patrol officers were leaving the department, resulting in low morale, and creating vacancies which, in turn, meant that the department was no longer providing street coverage on a 24/7 basis.

35.    One specific proposal supported by Nett was the elimination of the position of Deputy Chief of Police. That position was created in 2017 in response to a lawsuit filed by a former Chief of Police. The Chief and two sergeants involved in that case were no longer with the Police Department, and Nett opined that the position could be eliminated in favor of devoting more resources to on-the-street patrol officers.

36.    The election was a divisive affair. The issues were fundamental and the Bertaut-Nett-Khalil slate was promising a significant change in the direction of Town government.

37.     Those opposed to the Bertaut-Nett-Khalil slate were not content with just letting the election results determine the future of the Town. They set out to discredit Nett and pressure him to leave the race, thereby retaining their majority power.

38.     Since announcing his candidacy for Town Council in February 2024, Nett was consistently subjected to petty workplace harassments and direct targeting efforts by supervisors in the Police Department. Nett was the subject of several Internal Affairs (IA) investigations and other adverse personnel actions, in rapid succession, intended to intimidate him and discourage his political activity.

39.     For example, on one occasion, when a political opponent lodged a petty complaint against Nett, Internal Affairs ("IA") investigators disarmed Nett while he was still in uniform and interviewed him in the suspect interview room, despite the clear political implications of the complaint. Nett was denied a copy, or any evidence of, the complaint. The IA officers questioned Nett at length about his lawful political activity, including asking him with whom on Town Council he communicated and how often.

40.     The Police Department tried to deny Nett participation in the Town's Fourth of July Parade alongside other candidates for office.

41.     Lombrana questioned Nett in the workplace about political flyers distributed throughout the community by Nett and his allied slate of candidates.

42.     On August 8, 2024, Nett responded to a dispatched complaint regarding a dog locked in a car. When Nett arrived on the scene, the dog was out of the car and being held by its owner. With everything in order on the scene, Nett did not activate his Body Worn Camera ("BWC") or issue any citations. The complaining resident was upset that Nett did not cite or arrest the dog's owner, so they filed a complaint with the Police Department. The complaint was

8

unwarranted under departmental rules. However, when Lombrana was hired the following month, she resurrected the complaint and ordered Holman and Sergeant David Camp ("Camp"), Nett's supervisor at the time, to find Nett in violation of departmental orders for not having activated his BWC on the scene. Departmental policy held that activation of BWCs was discretionary under those circumstances. However, Camp wrote up the disciplinary notice because he was ordered to do so by Lombrana, and Holman sustained it.

43.    Lombrana threatened Nett with termination because he passed out "Junior Purcellville Police Officer" stickers to children at a community event (which was 26 days prior to Lombrana's threat), while off duty and campaigning for office. These stickers were provided to Nett, unsolicited, by a supervisory Sergeant for that very purpose, at that event, as part of ongoing community engagement efforts.

44.    On October 21, 2024, while in uniform and on duty, Nett was dispatched to the Carver Center for a parking complaint. Early voting was underway at the site and Mayor Milan, running for re-election on the slate opposed to Bertaut-Nett-Khalil, was present and campaigning. Milan took photographs of Nett while Nett was interviewing the complainant and sent the photographs to Lombrana. Lombrana then ordered Nett not to return to the Carver Center unless he was responding to a 911 call. Stought jumped on social media and falsely accused Nett of campaigning at the site while in uniform (which would have been illegal), even though Nett was only conducting police business.

45.    The Police Department's command staff held closed door meetings with Nett's opposition candidates. Officers sympathetic to Nett informed Nett of these political meetings that were occurring in Town offices.

46.     Other opponents of the Bertaut-Nett-Khalil slate placed political campaign signs for the opposing slate on the grounds of the Purcellville Police Department headquarters, making it appear that the Police Department opposed the Bertaut-Nett-Khalil slate. In reality, the private-sector owner of the land upon which the headquarters sat approved the placement of the signs, giving the opponents deniability while continuing the subtle, false subtext that the police opposed the slate and, in particular, Nett, who was the police officer candidate.

47.     On election eve, Lombrana notified Nett that he had been "randomly" selected for a drug screening test. The timing alone of this request seemed to suggest Lombrana was hoping to land a surprise positive result to influence the election. She did not get the result she was hoping for.

48.     Rayner and Luke were sitting councilmembers in 2024 and not on the ballot. Wright, Stought, Nett, and Khalil won Council seats. Bertaut defeated the incumbent Mayor.

49.     The result of the 2024 elections was that Bertaut, Nett, Khalil, and Luke formed a 4-3 majority on the Town Council.

**The Conspirators Work to Control the Town and Terminate Nett After the Election.**

50.     Rayner, Wright, and Stought were unable (or unwilling) to accept the election results. They could not challenge the results themselves, as the election was fair and the results were not in dispute. Instead, they worked with allies within the Town government, and outside, to control Town policy, despite their minority status.

51.     Rayner, Wright, Stought, and their supporters who acted in concert to continue to oppose and disrupt the new Council majority, and to run the Town through minority status, are referred to herein as the "Conspirators."

52.    In July 2024, approximately four months before Nett's election, the Purcellville Employee Handbook (the "Handbook") underwent its first update in 19 years. A number of changes were made in the Handbook. Snellbaker inserted her own change, which stated that "no employee shall continue in their position with the Town after election to any public office in the Town." The change was not pointed out to others involved in the drafting process and became part of the Handbook thereafter.

53.    The Handbook revision was specifically designed as an attempt to force Nett to give up his Council seat if he won. The alternative, Snellbaker thought, would require Nett to resign from his job as police officer, which was Nett's full-time employment and means of supporting his family.

54.    After the election, the Conspirators asserted Nett was barred from taking office because his employment as a police officer created a conflict of interest. Snellbaker sent Nett a formal demand that he resign either from the Town Council or the Police Department in light of the Handbook's prohibition against serving in both capacities (of which Nett was unaware because the change was not advertised when implemented).

55.    Stewart Petoe ("Petoe"), the Executive Director of the Virginia Conflict of Interest and Ethics Advisory Council, however, issued an opinion permitting Nett to hold both positions, referencing Virginia Code §2.2-3107(B)(1)(ii).

56.    After Petoe issued his opinion, the Town removed the prohibition from the Handbook.

57.    However, the Conspirators were not deterred.

58.    Lombrana, whose job was now in jeopardy due to Nett's win; Holman, who was allied with Lombrana in the Police Department; Diana Hays, who was Assistant Town Manager;

and LaDonna Snellbaker, who was Director of Human Resources; actively supported Rayner, Wright, and Stought and were fellow Conspirators.

59. Following the election, and as a reflection of the divisiveness of the campaign and election results, the Chief of Police resigned.

60. Kwasi Fraser, a former Mayor who had supported the Bertaut-Nett-Khalil slate, was hired as Town Manager. Lombrana, as Deputy Chief of Police, became Interim Chief. The new majority on the Town Council intended to hire a permanent Chief of Police in the future.

61. Lombrana and Holman, with the support of the Rayner-Wright-Stought slate and other opponents of the majority, then set out to attack Nett from within the Police Department.

62. On January 10, 2025, Nett attended an "agenda planning" meeting at Town Hall from 8:00 a.m. to 9:00 a.m. Nett, although on duty as a police officer, and in uniform, attended at the direction of the Town Manager.

63. The "agenda planning" meeting was typically organized by the Mayor in advance of Town Council meetings to put together the agenda for the upcoming meeting and otherwise discuss Town business. Nett had been selected as Vice Mayor and it was not unusual for the Vice Mayor to be invited to these meetings.

64. Nett registered himself with the Police Department as on "directed patrol" during the meeting. "Directed Patrol" was a commonly - used status for police officers who were assigned to be on patrol, but temporarily not "on the street" because of other activities. For example, an officer who was picking up dry cleaning, grabbing something to eat, or attending to a personal matter might mark himself as on "directed patrol." That status meant the officer was available to respond to calls but was not engaged in active patrol on the street.

65.     Rayner, Wright, and Stought orchestrated a complaint against Nett arising out of the agenda-planning meeting.

66.     An unidentified conspirator induced a community member to file a complaint about Nett's attendance at the meeting while on directed patrol. On January 30, 2025, the community member filed a formal complaint against Nett with the Police Department.

67.     Holman, who was now Nett's supervisor in the Police Department, used the citizen complaint, which the Conspirators had solicited, as a means to begin an investigation of Nett.

68.     On January 7, 2025, Nett registered to attend the Virginia Municipal League ("VML") Annual Local Government Day, scheduled for January 30, 2025, in Richmond. This was a day when city and town officials from across Virginia gathered in Richmond to meet with members of the General Assembly to discuss state issues of concern to municipalities.

69.     Nett completed the Town's Pre-Travel and Training Authorization Form, which contained both estimated and actual anticipated costs for attendance, including lodging, per diem, mileage, and the conference fee.

70.     On January 28, 2025, Nett decided not to attend the VML conference, both because he was recovering from lingering flu-like symptoms and because his right knee, which suffered from various orthopedic problems, was bothering him. He sent his supervisor, Holman, an email taking sick leave for the next two days, because he did not believe he was in physical shape to conduct police activities.

71.     Luke offered to drive Nett to Richmond for the VML conference due to Nett's concerns that he did not feel well enough to make the lengthy drive and, further, was unable to drive due to the pain in his knee. Nett determined he would be able to participate in the conference if he did not have to drive, so he accepted Luke's invitation and attended the conference.

13

72.	While at the conference, Rayner, who was also attending, observed from across the room that Nett was present and "did not appear to be sick." Rayner only spoke with Nett briefly. Rayner reported back to Lombrana or Holman that they had a "gotcha" moment on Nett.

73.	Rayner suggested Lombrana use the incident to file disciplinary charges against Nett.

74.	Upon his return from the conference, Nett was still feeling unwell and was increasingly under stress from the various efforts that the Conspirators had been using for months (outlined above) to undermine his ability to conduct either his police or Town Council duties.

75.	Nett advised Holman via email on February 3, 2025, that he would be out sick on February 4, 2025.

76.	On February 7, 2025, Holman provided Nett with notice that he was the subject of two more disciplinary investigations relating to the January 10 meeting and the January 29-30 VML conference. Holman refused to answer any questions from Nett or to allow Nett to explain any of the circumstances. Holman further presented Nett with "Orders of Confidentiality," which prevented Nett from discussing these new investigations with anyone, including the Town Manager (who had managerial authority over the Police Department).

77.	On February 8, 2025, Nett determined that his stress level had elevated too high to permit him to engage in effective police work. He advised Holman he would be out sick "until further notice."

78.	On February 13, 2025, Holman issued Nett a memorandum entitled "sick leave," wherein he stated that "use of sick leave for three days, or greater, requires a physician's statement to be provided to your supervisor and a copy sent to Human Resources." The memorandum further directed Nett to provide his expected return to work date and "the above listed documentation" by

February 17, 2025. The memorandum further contained a copy of the Town Personnel Manual. The applicable portion of the Manual that was copied and pasted into the memorandum contained the following sentence after the provision requiring that a doctor's note be provided for absences greater than three days: "Employees failing to provide documentation will not be permitted to return to duty until property [sic] medical documentation is obtained."

79.    Holman discussed the matter with Lombrana before issuing the memorandum, to make sure she was on board.

80.    To comply with Holman's directive, on February 16, 2025, Nett emailed Holman - copying Lombrana - reporting his expected return to work date. Reading both the memorandum and the cited Handbook provision together, Nett interpreted his response to be in conformity with the Handbook and made a mental note that he would need to get a note from his doctor before his return to work, to cover his absence.

81.    Neither Holman nor Lombrana replied to Nett's email.

82.    On February 18, 2025, Holman placed Nett on administrative leave, citing his alleged "insubordination" for not submitting a doctor's note as directed. Holman's memorandum to Nett threatened termination.

83.    At some point during January-February 2025, Lombana decided to try to terminate Nett and determined that the best way to do so would be to have an outside organization conduct an investigation and to come up with findings upon which a termination could be based.

84.    Lombrana did not seek authorization from the Town Manager to engage another police department to conduct the investigation, nor did she get permission for such expenditures.

85.    Lombrana approached the Fairfax County Police Department to conduct the investigation. The Fairfax Chief of Police declined. At the grievance hearing, Lombrana was asked

why she thought Fairfax declined to participate in the investigation and she answered, "There's no secret that politics are involved."

86.     Lombrana then went to the Prince William County Police Department, which apparently agreed to cooperate. Tacha conducted the "investigation." Tacha relied exclusively on Rayner's statement regarding Nett's health at the VML conference on January 29-30.

87.     Luke, who drove Nett to Richmond for the VML conference and spent considerable time with him during the conference, was never interviewed by Tacha during the "investigation" directed by Holman and Lombrana.

88.     In fact, it appears Rayner was the only person interviewed in the "investigation."

89.     On February 21, 2025, Lombrana issued an "advanced notice of discipline" memorandum to Nett, proposing to terminate him due to his attendance at the January 10 "agenda planning" meeting and because he had not responded Holman's call or emails regarding his sick leave status, even though Nett was on sick leave during this time.

90.     Also on February 21, 2025, Lombrana issued a second "advanced notice of discipline" to Nett, proposing to terminate him for failing to follow policy regarding his use of sick leave on January 29-30 (when he attended the VML conference) as well as not cooperating in the subsequent investigation.

91.     Lombrana also leaked to the press a false allegation that Nett had received a $197.40 mileage reimbursement for the trip to the VML conference even though he had not driven there. Lombrana based her statement on Nett's original proposed budget for attending the conference. Nett never sought actual reimbursement for the mileage because at the last minute he accepted a ride from Luke.

16

92.    Town policy required the Chief of Police to gain approval of the Town Manager before terminating a police officer. Good practice requires a Chief to seek advice from the Town Attorney before taking important legal action.

93.    Lombrana did not seek approval of the Town Manager, or advice from the Town Attorney, before issuing the advanced notices of discipline to Nett.

94.    Rayner, Wright, and Stought all supported Lombrana's efforts and gave her "cover" to proceed despite her lack of support from the Town Manager, who was her direct supervisor.

95.    Lombrana did not stop there. In order to hedge her bets and ensure Nett's termination, she reported to Anderson, the Commonwealth's Attorney, that Nett had been found guilty of dishonesty and should be banned from testifying in court.

96.    Anderson's Chief Deputy Commonwealth's Attorney is Nicole Wittmann ("Wittmann"), who is a close friend of Rayner's. Rayner served as Whittman's campaign manager in 2019 when Wittman ran unsuccessfully for Commonwealth's Attorney.

97.    Upon information and belief, Wittmann advocated to Anderson to take action against Nett, at Rayner's urging.

98.    On February 24, 2025, Anderson, without carefully reviewing the "investigatory" file or determining the specific facts at issue, nor taking into account Nett's right to contest Lombrana's allegations through a grievance, notified Lombrana that he had placed Nett on his Brady/Giglio list.

99.    The Brady/Giglio list is a list maintained by each prosecutor across the country. It is a list of police officers who have been found guilty or liable for an offence involving truthfulness or credibility. *Brady* and *Giglio* are court cases that require prosecutors to inform defense attorneys in criminal cases if any of the witnesses in the case, or people who were involved in any way in

17

the arrest or prosecution of a criminal defendant, have been adjudicated as dishonest due to lacking truthfulness or credibility in any proceeding. Such information can then be used by the criminal defense attorney in cross examination of that witness. Because such cross-examination can be so powerful and cause prosecutors to lose the case, prosecutors maintain a list of officers they will not call as witnesses in any case in which they are involved, as the most effective way to avoid such cross-examination. Consequently, once an officer is placed on a Brady/Giglio list, no prosecutor will call him as a witness and no law enforcement agency will employ the officer. Simply put, placement on a Brady/Giglio list ends the law enforcement career of the officer, without appeal or recourse.

100.   Anderson is a resident of Purcellville, Va.

101.   Upon information and belief, Anderson is connected to and sympathetic to the political views of the opponents of the Bertaut-Nett-Khalil slate.

102.   Anderson did not engage in any investigation of his own before placing Nett on the Brady/Giglio list.

103.   Anderson did not carefully review whatever investigation was conducted by Prince William County into Nett's actions.

104.   Anderson did not place Nett on the Brady/Giglio because of any honestly-held, professional assessment that Nett violated the law or departmental rules.

105.   No reasonable prosecutor would have supported the discipline against Nett based on such a flimsy investigative report.

106.   No reasonable prosecutor would have placed a police officer like Nett on the Brady/Giglio list before ascertaining that the charges against the officer were sound and that the officer had exhausted all his administrative remedies to challenge the discipline.

107.    Anderson placed Nett on the Brady/Giglio list because he supported the efforts of the Conspirators to remove Nett from the Town government by any means possible.

108.    As such, Anderson was acting outside the scope of his duties in placing Nett on the Brady/Giglio list and instead was using his office to support his personal, political agenda and to support the conspiracy against Nett.

109.    Consequently, Anderson's actions were *ultra vires* and not protected by the normal immunity accorded to prosecutors in making decisions about placing officers on the Brady/Giglio list.

110.    On March 19, 2025, Nett submitted to an interview by Tacha.

111.    On April 4, 2025, Lombrana issued a Notice of Dismissal/Termination to Nett, citing the two prior advanced notices of discipline and Anderson's notification that he had placed Nett on the Brady/Giglio list, as reasons supporting the termination.

112.    Town Manager Fraser, under pressure from the Conspirators, and with the belief that Town's grievance system would allow Nett to defeat what Fraser believed to be an improper use of authority by Lombrana, approved the termination.

**Nett Grieves His Termination.**

113.    Pursuant to Town Policy, Nett was given the opportunity to contest his termination through either the Town Grievance Policy or the State Law Enforcement Officer's Procedural Guarantee Act.

114.    Nett chose the Town Grievance Policy (the "Grievance Policy") because the termination was not based on any law enforcement actions but on allegations of improper use of sick leave and due to the political considerations that so obviously infected the process. A copy of the Grievance Policy is attached as **Ex. A**.

115.    Nett timely filed his grievance.

116.    Cafferky, the long-time Town Attorney, recused himself from the defense of the grievance, upon information and belief because he had recommended against the action to terminate Nett.

117.    The Town retained Sproul to represent it in the grievance process.

118.    Cafferky indicated his interest in completely terminating his service as Town Attorney.

119.    Sproul saw an opportunity to secure the contract to be the new Town Attorney.

120.    The Town Grievance Process contained preliminary procedural steps and ended with an evidentiary hearing conducted before a three-person panel.

121.    Nett and the Town, through their respective counsel, worked through the procedural steps of the Grievance Policy. Recognizing the importance of the issues involved, the role of counsel on both sides of the grievance, and the advisability of getting a resolution on the merits, and not wanting the process to be derailed by accidental communications or unclear deadlines, the Town and Nett agreed to follow certain procedures to work through the procedures in the Grievance Policy.

122.    One issue confronting the parties was that the Town's Human Resources Director, Snellbaker, had failed to populate a list of grievance panelists for use in Town grievances, despite the direction to do so contained in the Town Grievance Policy. *See* Grievance Policy, Ex. A, at §14.11(A)(1).

123.    On April 23, 2025, the Town and Nett signed an "Agreement for Grievance Procedure re: Carl B. Nett and the Town of Purcellville, Virginia," which was drafted by Sproul,

with input from undersigned counsel (the "Process Agreement"). A copy of the Process Agreement is attached as **Ex. B.** Of note, the Process Agreement provided the following:

    a)    That "the parties acknowledge and agree that the procedure found [in] the Town of Purcellville Employee Handbook … complies with Virginia Code §§ 15.2-1506 and 1507 …"

    b)    That "neither party objects to the use of said procedure for the grievance" and

    c)    That "the parties acknowledge that the Town does not maintain a list of potential panel members. The parties agree that each party shall select a panel of their choosing, and that the panel members chosen by the parties shall select the third panel member."

*See* Process Agreement, Ex. B.

124.    Nett and the Town worked through the preliminary steps in accordance with the Process Agreement.

125.    When the steps reached the Town Manager, Fraser recused himself as the Town's representative in the grievance process and designated Hays, the Assistant Town Manager, to act in his stead.

126.    Fraser recused himself due to threats, real or implied, from the Rayner, Wright, and Stought group.

127.    Hays denied the grievance at the Step 3 level.

128.    When they reached Step 4, which was the panel hearing, each party picked a panel member. The two panel members got together and selected a third member, who served as chair (together the "Panel"). This process was the one agreed to in the Process Agreement.

129.    An all-day evidentiary hearing was held on June 25, 2025, in accordance with the Grievance Policy, as further stipulated through the Process Agreement. The hearing was conducted by the three selected panel members (the "Panel Hearing").

130.    On June 28, 2025, the Panel issued a 21-page unanimous written decision, upholding the grievance in all respects (the "Panel Decision"). A copy of the Panel Decision is attached as **Ex. C.**

131.    The Panel Decision reviewed, in painstaking detail, each of the five reasons for Nett's termination and rejected each one:

(a)    As to the January 10 Planning Session, the Panel found the Town had no policy regarding what responsibilities are given to an officer on directed patrol, and added that it was the Town's responsibility, not Nett's, to develop "clear policies and procedures governing Mr. Nett's dual role as police officer and Town Councilman." Panel Decision, Ex. C, at 3.

(b)    As to taking sick leave for the VML conference on January 29-30, the Panel found the Town never produced the report from Sergeant Tacha's investigation and relied only on Rayner's statements. Other witnesses were not interviewed. The Panel noted that Luke's testimony at the hearing was consistent with Nett's and that Nett's illness was corroborated. The Panel stated it did not find "the Prince William IA investigation [Tacha's], or any documents or judgments based off of it, to be credible." *Id.* at 4-6.

(c)    As to Nett's alleged failure to cooperate with Tacha's investigation, the Panel found Nett did participate, although "late." It noted that Nett was on sick leave during the

22

investigation and that the Town Manager (Fraser) told Nett not to participate because Fraser had not authorized the investigation. *Id.* at 7-8.

(d)    As to Nett's failure to submit a doctor's note, the Panel found that the Handbook required a doctor's note to be submitted on return to duty, not while still on sick leave. It further found that Holman's directive for an earlier note itself violated the Handbook and that the required timeframe he ordered was "patently unreasonable." *Id.* at 9-10.

(e)    As to Nett's placement on the Brady/Giglio list, the Panel wrote "it is clear to this Panel that Mr. Nett was not guilty of any malfeasance in connection with the events listed in Mr. Anderson's Brady list letter and that placement on the Brady list does not, in and of itself, require termination of employment. *Id.* at 11.

132.    The Panel further found that "[t]estimony from Lt. Holman and Chief Lombrana demonstrated that they failed to follow the progressive and proportionate disciplinary requirements in violation of both the Handbook and the General Orders." *Id.* at 13.

133.    The Panel further noted Lombrana's admission that, as a police officer herself, Lombrana was required to follow instructions from her supervisor, but she admitted she disobeyed instructions from her supervisor, the Town Manager, to reinstate Nett. *Id.* at 14.

134.    The Panel further concluded that "the Department's Actions Were Politically Motivated" and specifically noted Lombrana's admission, in her testimony, that "there's … no secret that politics are involved." *Id.* at 15-16.

135.    The Panel also concluded that "Mr. Anderon's office had little choice but to place Mr. Nett on the Brady list based on the information provided by Chief Lombrana which has now been shown to be incomplete and flawed." *Id.* at 19.

136.    The Panel Decision ordered that the Town's termination of Nett was reversed, that Nett be reinstated with back pay and benefits "as provided by the Handbook and applicable law," and that Nett's attorneys' fees be paid. Nett's attorney was directed to submit a petition for the award of fees in accordance with the Grievance Policy, which limited the fees to $144 per hour. *Id.* at 19-20.

**Lombrana Takes Further Detrimental Action Against Nett.**

137.    Lombrana had reported the advanced notices of disciplinary action to Anderson prior to those actions becoming finalized.

138.    Lombrana had no duty to make the report to Anderson and, in fact, owed a duty to Nett and to the Town not to make a report of a *proposed* disciplinary action to an outside party before the discipline became final after all grievance rights were exhausted.

139.    Lombrana made the report to Anderson because she knew the advanced notices of discipline, based on thin evidence of minor attendance issues, were unlikely to hold up through the grievance process.

140.    Lombrana reported these allegations to Anderson in order to get Anderson to place Nett on the Brady/Giglio list, so she could then use Nett's placement on the list as an additional ground for termination. As such, she created circular reasoning in an attempt to fire Nett and deny him due process.

141.    Lombrana further reported the advanced notice of discipline and termination "decision" to the Virginia Department of Criminal Justice Services ("DCJS") on April 4, 2025, in order to have the Commonwealth revoke Nett's certification as a police officer.

142.    When Lombrana lost the grievance hearing, she informed DCJS of that fact, but also of Anderson's placement of Nett on the Brady/Giglio list. She noted the continued legal

proceedings but said Nett would not be returning to the Department, so DCJS continued to process the proposal to decertify Nett as a police officer.

143.   DCJS did, in fact, decertify Nett as a police office on December 2, 2025.

144.   Upon notice by Nett and a copy of the Panel Decision, however, DCJS has accepted Nett's appeal of that decertification decision and stayed that appeal pending resolution of Nett's due process rights, in accordance with Virginia law.

**Anderson Inserts Himself into Town Government Operations.**

145.   Anderson inserted himself into Town government operations during the grievance process. On April 21, 2025, Anderson issued an "advisory opinion" which accused Nett of violating the State and Local Government Conflict of Interest Act ("COIA") for serving as both a Town Councilmember and Police Officer. Anderson's opinion was at odds with the previous opinion of Stewart Petoe, the Executive Director of the Virginia Conflict of Interest and Eithics Advisory Council, who had approved the dual positions.

146.   Anderson further raised issues arising out of responses that Nett provided to Mike Jones, at Jones's request, when Jones was conducting a management study of the Purcellville Police Department.

147.   Anderson ignored the management study's statement of work, which stated, "the Consultant will … conduct interviews with all available Police Department employees … [e]ngage with Town Council members … [e]valuate whether the current department structure is optimal for operational needs … [and] conduct in-person interviews …" Instead, Anderson asserted Nett's communication with Jones was "not appropriate under any scenario."

25

148.    Anderson also cited Nett's participation in a vote involving the Police Department held on April 8, 2025, even though the Town Attorney and the Executive Director of COIA (Petoe) cleared Nett to participate.

149.    On April 28, 2025, prompted by an inquiry from Stought, Anderson issued an additional Advisory Opinion that Nett was prohibited from being present in Council Chambers during any Council discussions regarding the Police Department. Council practice was for members on recusal to remain present but not participate in the ensuing discussion or votes for the matter at-hand. Anderson's Advisory Opinion threatened Nett with criminal prosecution if he failed not only to recuse himself (from discussions and votes he had been cleared to participate in by the Executive Director of COIA), but remove himself from Council Chambers entirely during said discussion and votes.

150.    Anderson's actions were at odds with advice given to the Council by Cafferky, the Town Attorney whose job it was to advise the Town. Anderson was a tool of the Rayner-Wright-Stought slate which sought to find an end-around Cafferky whenever Cafferky's legal opinions differed from their political agenda.

**The Conspirators Refuse to Implement the Panel Decision.**

151.    The Grievance Policy provides that after a panel issues its decision, "The question of whether the relief granted by a panel is consistent with written policy shall be determined by the Town Manager or their designee, unless the Town Manager or their designee has a direct personal involvement with the event(s) giving rise to the grievance. In that case, the decision shall be made by the Chief Judge of the Loudoun County Circuit Court." Grievance Policy, Ex. A, at §14.12.

152. Despite having recused himself from representing the Town during the grievance process, Cafferky, on July 8, 2025, sent a letter to Chief Judge Fleming of the Loudoun County Circuit Court. The letter stated that Cafferky determined that the Town Manager did have direct personal involvement in the case and, consequently, on behalf of the Town, he asked the Chief Judge to answer the question posed by the Grievance Policy and outlined in the previous paragraph (the "July 8 Letter").

153. Cafferky could have passed the decision to Hays. Hays had been appointed Acting Town Manager a short time earlier when Fraser was placed on administrative leave due to a different – although tangentially related – matter. However, Cafferky did not believe that Hays would handle the matter properly as she was a supporter of the Rayner-Wright-Stought conspiracy.

154. Cafferky hoped the Circuit Court would bail the Town out of the quagmire in which it had placed itself.

155. On July 29, 2025, the Chief of Staff to Judge Fleming sent a letter to Cafferky, stating that the July 8 Letter was not in the form of a petition, as required by statute, and would not be acted upon by the Court.

156. On August 12, 2025, the Town, through Cafferky, filed a Petition with the Circuit Court, asking that the Chief Judge rule on the question called for in the Grievance Policy: whether the relief awarded by the Panel was consistent with the Grievance Policy.

157. The Petition did not explicitly ask the Court to rule that the relief granted by the Panel was consistent with the Grievance Policy, but a fair reading of the petition would lead the reader to that conclusion.

158. The Chief Judge ordered further briefing on the question of whether he had proper jurisdiction to rule on the petition.

159. After such briefing and oral argument, on October 27, 2025, Chief Judge Fleming issued a Letter Opinion (the "Fleming Opinion"), stating that he did not have jurisdiction to rule on the Petition and dismissing the Petition for lack of subject matter jurisdiction. *See* Fleming Opinion, attached as **Ex. D**.

160. Thus, the matter of the certification of the relief granted by the Panel was back on the desk of the Town Manager.

161. On November 12, 2025, the Town Council appointed Sabio as the new interim Town Manager, replacing Hays. The appointment was effective November 14, 2025, in order to provide Hays with time to make the required determination of whether the relief ordered by the Panel was consistent with the Grievance Policy.

162. Rayner, Wright, and Stought opposed the appointment of Sabio, wishing instead to appoint someone who would support their conspiracy.

163. Also on November 12, 2025, the Town Council considered a resolution to direct Hays either to answer the question about the Panel Decision and implement the Decision or to notify the Town Council of her refusal to do so, by the following day. The resolution failed on a 3-3 vote after Nett recused himself and the conspirator members (Rayner, Wright, and Stought) opposed.

164. On November 13, 2025, Hays, seeking to preempt any action by Sabio to resolve the issue of the grievance, recused herself from answering the question of whether the relief awarded by the Panel was in accordance with the Grievance Policy. Instead of letting Sabio handle the matter on the following day, Hays passed the matter to Anderson, allegedly pursuant to Va. Code § 15.2-1507(A)(10)(a)(7), and despite the fact that the Grievance Policy did not permit that assignment.

28

165.    Hays, having asserted that she was conflicted, should not have acted by sending the matter to Anderson, as her intent in doing so was for Anderson to support the conspiracy. She knew that Sabio would not support the conspiracy.

166.    On November 17, 2025, Anderson also recused himself from that matter. He secured from the Circuit Court the appointment of Olsen as Special Prosecutor to handle the decision (despite the fact that the issue was not "prosecutorial").

167.    On November 24, 2025, Olsen, having been appointed Special Prosecutor only seven days earlier, issued an 11-page, single spaced "Letter Opinion" that contained a comprehensive assessment of state law (the "Olsen Opinion"). The Olsen Opinion did not answer the question that was posed to Olsen through Hays and Anderson (whether the relief granted by the Panel Decision was consistent with the Grievance Policy). Instead, the Olsen Opinion stated that the entire grievance process was not in accordance with state law and, therefore, was of no effect. *See* Olsen Opinion, attached as **Ex. E**.

168.    Upon information and belief, Anderson had significant input into the Olsen Opinion.

169.    The Olsen Opinion did not address the stipulations contained in the Process Agreement and Olsen did not give Nett any opportunity to present argument on the issues.

170.    After Olsen issued his letter opinion, Nett, through counsel, again insisted that the Town complete the grievance process by issuing a finding on whether the relief awarded by the Panel Decision was consistent with the Grievance Policy.

171.    By answering that question, the Town would have completed the grievance process. At that point, either the Town could have implemented the relief ordered by the Panel, or if it decided not to, Nett could have petitioned the Circuit Court for an Order enforcing the Panel

Decision. *See* Grievance Policy, Ex. A, at § 14.12. But by refusing to answer that question, the Town purposefully and intentionally did not complete the grievance process, thereby foreclosing Nett from the opportunity of seeking enforcement of the decision.

172. Nett again, through counsel, insisted that the Town complete the grievance process.

173. Sproul, now the Town Attorney after Cafferky's resignation, recused himself from the matter in favor of "insurance counsel." New counsel for the Town, Heather Bardot ("Bardot"), proposed that Nett agree to discard the Panel Decision and that the Town hold a new hearing in front of a state-appointed hearing officer. Nett declined and noted that the Town already agreed to a process in the Process Agreement and that the Town needed to take some action regarding the relief granted by the Panel. Nett also requested assurances from Bardot that, if he won a subsequent hearing, the Town would honor that decision and not raise procedural objections as it had after the initial panel hearing.

174. Bardot refused to give the assurances.

175. On January 8, 2026, Bardot, on behalf of the Town, stated in a letter to Nett's counsel that the Town would take no further action.

176. Nett, having been foreclosed from any avenue to complete the grievance process in accordance with his due process rights, then filed this action.

177. As a result of Defendants' wrongful acts, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

**COUNT ONE**
**(Deprivation of Property Without Due Process Rights – 14th Amendment – Loudermill)**
**(Against the Town)**

178.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

179.    Nett held a permanent appointment as a Purcellville Police Officer.

180.    Nett held a constitutionally – protected property interest in his government employment, which could only be taken from him after providing him with certain due process rights. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985).

181.    The law of the Commonwealth of Virginia requires municipalities to provide a grievance process for municipal employees to grieve certain employment actions, such as terminations. Law enforcement officers are provided the right to grieve their termination or other discipline through either the Law Enforcement Officers' Procedural Guarantee Act (the "Act") or the municipal grievance procedure, but not both. Va. Code § 9.1-500-507; Grievance Policy, Ex. A, at § 14.3.

182.    Having provided Nett with this process for grieving a termination, the 14th Amendment requires that the process be provided by the State and Municipality.

183.    By refusing to complete the grievance process, or to honor the Panel Decision, the Town deprived Nett of his federally - protected due process rights.

184.    The Town's actions have left Nett without the ability to have notice or provide an opportunity to respond to his termination. While he was given a hearing, the result was taken away when the Town refused to complete the process (by certifying that the relief granted was consistent with the Grievance Policy) after realizing it was going to lose. Instead, he was effectively terminated without any right to review or other recourse.

31

185.   Due to the Town's actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

WHEREFORE, Plaintiff requests that the Town's termination of him be overturned and that he be afforded his full due process rights to contest his termination, which requires implementation of the Panel Decision. Plaintiff further requests that he be awarded $1 million in damages for the Town's violation of his rights, plus an award of attorneys' fees.

## COUNT TWO
### (Deprivation of Liberty Interest - Without Due Process Rights – 14th Amendment – Sciolino v. City of Newport News)
### (Against the Town)

186.   Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

187.   Nett has a constitutionally - protected liberty interest in his professional reputation as a municipal police officer.

188.   When Lombrana intentionally informed Anderson of her proposed discipline of Nett, to convince Anderson to place Nett on the Brady/Giglio list, and Anderson did so, Nett was deprived of his liberty interest.

189.   When Lombrana informed DCJS of the termination of Nett, prior to the completion of the grievance process, with the intent of having the Commonwealth decertify Nett as a police officer, and then refused to inform DCJS that the Town was disrupting the grievance process, Lombrana deprived Nett of his liberty interest.

190.   Lombrana's actions are attributed to the Town.

32

191.    The reports to Anderson and DCJS deprived Nett of his liberty interest because (a) the charges placed a stigma on Nett's professional reputation, (b) the charges were made public, at least beyond the walls of the Town government, when they were conveyed to the Commonwealth's Attorney and DCJS, (c) the charges were made in conjunction with the termination of Nett's employment, and (d) the charges were false.

192.    By making these charges public, or to parties outside of the Town, before Nett had the opportunity to refute them through the grievance process, and then by failing to retract them when Nett prevailed in the grievance hearing, Lombrana and the Town deprived Nett of his liberty interest in his reputation without due process, in violation of the 14th Amendment to the United States Constitution.

193.    Due to the Town's actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

WHEREFORE, Plaintiff requests that he be awarded $5 million in compensatory damages, plus punitive damages, and attorneys' fees.

### COUNT THREE
### (State Due Process – Completion of Grievance Process)
### (Against the Town)

194.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

195.    Under the Grievance Policy, Nett was entitled to a Panel Hearing regarding his termination.

196.    Pursuant to the Law Enforcement Officers' Procedural Guarantee Act (the "Act"), Nett had the option of choosing to grieve this termination under the Act, in front of a state hearing officer, or under the Grievance Policy, in front of a grievance panel. Nett chose the panel hearing.

197.    The Panel Hearing was conducted and the Panel ruled in Nett's favor, ordering that he be reinstated with back pay and benefits.

198.    The Grievance Policy next required that the Town Manager or their designee determine "whether the relief granted by a panel is consistent with written policy." *See* Grievance Policy, Ex. A, at § 14.12.

199.    The Town has refused to make the determination required by its own Grievance Policy.

200.    Any reasonable reading of the Panel Decision would find that "the relief granted by [the] panel is consistent with written policy" (the Grievance Policy).

201.    The Grievance Policy further provides that an employee may seek an Order from the Circuit Court, implementing the Decision.

202.    The Town refused to complete the process intentionally, as an effort to prevent Nett from seeking to enforce the Panel Decision in Circuit Court.

WHEREFORE, Plaintiff requests that the Court issue an order declaring that the relief granted by the Panel Decision was, in fact, consistent with Town Policy, and order the Town to implement the Decision. Alternatively, Plaintiff requests that this matter be remanded to the Town Manager with an order directing that the Town Manager answer the question of whether the relief granted by the panel was consistent with Town Policy, that the answer be in the affirmative, and that the Decision be implemented.

34

**COUNT FOUR**
**(Breach of Contract – Process Agreement)**
**(Against the Town)**

203. Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

204. The Process Agreement was a contract between the Town and Nett.

205. Under the Process Agreement, the Town and Nett "acknowledge[d] and agree[d] that the procedure found [sic] the Town of Purcellville Employee Handbook … complies with Virginia Code §§ 15.2-1506 and 1507 … Neither party objects to the use of said procedure for the grievance." *See* Process Agreement, Ex. B, at para. 2.

206. Further under the Process Agreement, the Town and Nett agreed to hold a panel hearing where the panel members would be selected one by the Town, one by Nett, and the third by the other two. *See* Process Agreement, Ex. B, at Step 4.

207. At the conclusion of the Panel Hearing, and upon receipt of the Panel Decision, the Town breached the contract by objecting to the procedure used, after specifically agreeing in the Process Agreement that they did not object.

208. The Town further breached the contract by failing to accept the Panel Decision, due to the manner in which the Panel was selected, after specifically agreeing in the contract to that process.

209. Due to the Town's breach of contract, Nett has lost his employment and associated wages and benefits.

210. Nett has further suffered the potential for decertification of his police powers, the final decision of which will be made by the Commonwealth under Va. Code § 15.2-1707. That

35

decision is likely to be based on the outcome of whatever hearing is, in the end, held to be the applicable review of his employment actions.

211.  Such damages are consequential to the breach and were foreseeable by the Town.

WHEREFORE, Nett asks that the Court award him specific performance of the contract and order the Town to accept the decision of the Panel. In the alternative, Nett requests that the Court award him $3 million in actual and consequential damages.

**COUNT FIVE**
**(Retaliation Under 1st Amendment to the United States Constitution and Article 1, Section 12 of the Virginia Constitution - Free Speech – Matter of Public Concern)**
**(Against the Town)**

212.  Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

213.  Nett's advocacy for streamlined government, lower utility costs, opposition to annexations into the Town for commercial and industrial development, and reform of the police department (both during the 2024 campaign and during Nett's service as a Town Councilmember in 2025), were speech on matters of public concern.

214.  As such, this speech is entitled to protection under the First Amendment to the United States Constitution and Article 1, Section 12 of the Virginia Constitution.

215.  The actions of the Town to try to deter Nett's campaign for public office, to influence the election improperly through the placement of signs in front of police headquarters, to deny Nett his seat on the Council through the misapplication of conflict of interest and ethics rules, to drive Nett from office through micromanagement of his work as a police officer and then termination on trumped-up charges of minor infractions, to deny Nett his due process rights to grieve his termination, and to the public humiliation of him through the placement of Nett on the

36

Brady/Giglio list and seeking to decertify him as a police officer, were actions through which the Town unconstitutionally retaliated against Nett for his exercise of his rights to Free Speech.

216.    Due to the Town's actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

WHEREFORE, Plaintiff requests that the Court award him $5 million in damages, plus his attorneys' fees and costs, for damages arising out of the unconstitutional retaliation against him.

## COUNT SIX
### (Violation of Civil Rights Under Color of Law – Monell – 42 U.S.C. §1983)
### (Against the Town and Defendants Rayner, Wright, Stought, Lombrana, Holman, Hays, and Snellbaker in their Official Capacities)

217.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

218.    Rayner, Wright, and Stought, as Town Councilmembers and by working in concert with other Town leaders to create and implement their policies in the Town, were Town policymakers.

219.    The Town's actions, which include the actions of Rayner, Wright, Stought, Lombrana, Holman, Hays, and Snellbaker in their official capacities, were made pursuant to the polices created by Rayner, Wright, and Stought.

220.    Rayner reported Nett's attendance at the VML conference with the intent of creating a disciplinary issue for Nett's termination. To do so, Rayner must have had advanced information, from Lombrana or Holman, that Nett had taken sick leave for the conference dates, showing that the individual defendants were acting in concert.

37

221.    Rayner, Stought, and Wright either directed or approved Hay's refusal to certify that the relief ordered by the Panel was consistent with the Grievance Policy, where such certification would have concluded the grievance process. In fact, Rayner, Stought, and Wright all voted against a resolution which would have required Hays to answer the question.

222.    Stought requested that Anderson provide legal opinions on questions pertaining to Nett in order to create conflict with the legal opinions given by the Town Attorney, which generally supported Nett.

223.    Lombrana provided Anderson with incomplete information so Nett would be placed on the Brady/Giglio list.

224.    The Town's actions to deter Nett's campaign for public office, to influence the election improperly through the placement of signs in front of police headquarters, to deny Nett his seat on the Council through the misapplication of conflict of interest and ethics rules, to drive Nett from office through micromanagement of his work as a police officer and then terminate him on trumped-up charges of minor infractions, to deny Nett his due process rights to grieve his termination, and to publicly humiliate him through the placement of Nett on the Brady/Giglio list and seek to decertify him as a police officer, were actions of Town policymakers pursuant to Town policy they created and implemented.

225.    The purpose of the actions taken against Nett were to deprive him of his rights to Free Speech under the First Amendment to the United States Constitution and to due process under the 14th Amendment to the United States Constitution.

226.    The defendants took all relevant actions under color of law by using their capacities as municipal officials to achieve their goals.

227.    Due to the Defendants' actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

WHEREFORE, Plaintiff requests that the Court award him $5 million in damages, plus his attorneys' fees and costs, for damages arising out of the deprivation of his constitutional rights under color of law.

### COUNT SEVEN
### (Violation of Civil Rights Under Color of Law – 42 U.S.C. §1983)
### (Against Rayner, Wright, and Stought individually)

228.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

229.    Rayner, Wright, and Stought's actions were made under color of law as they used their voting power as members of Council and their combined authority as council members to get Lombrana, Holman, Hays, and Snellbaker to follow their direction.

230.    These defendants' improper actions, including deterring Nett's campaign for public office, influencing the election improperly through the placement of signs in front of police headquarters, trying to deny Nett his seat on the Council through the misapplication of conflict of interest and ethics rules, driving Nett from office through micromanagement of his work as a police officer and then terminating him on trumped-up charges of minor infractions, denying Nett his due process rights to grieve his termination, and publicly humiliating him through the placement of Nett on the Brady/Giglio list and seeking to decertify him as a police officer, were actions taken under color of law.

39

231.    The purpose of the actions taken against Nett were to deprive him of his rights to Free Speech under the First Amendment to the United States Constitution and to due process under the 14th Amendment to the United States Constitution.

232.    Due to the Defendants' actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

233.    The Defendants' actions were of such an egregious nature as to warrant the application of punitive damages.

WHEREFORE, Plaintiff requests that the Court award him $5 million in compensatory damages, $1 million in punitive damages, plus his attorneys' fees and costs, for damages arising out of the unconstitutional retaliation against him.

### COUNT EIGHT
**(Violation of Civil Rights Under Color of Law – 42 U.S.C. §1983)**
**(Against Lombrana and Holman individually)**

234.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

235.    Holman and Lombrana misapplied the Handbook and otherwise acted improperly in order to terminate Nett on trumped up charges.

236.    Lombrana and Holman knowingly used a wildly incomplete report by Tacha to justify both terminating Nett and asking Anderson to place him on the Brady/Giglio list.

237.    Lombrana and Holman took these actions because of their opposition to Nett's political statements and objectives as a candidate for and then as a sitting Town Councilmember.

40

238.    Lombrana and Holman misused their official positions to take these actions against Nett under color of law but for improper, individual purposes.

239.    The purpose of the actions taken against Nett were to deprive him of his rights to Free Speech under the First Amendment to the United States Constitution and to Due Process under the 14th Amendment to the United States Constitution.

240.    Due to the Defendants' actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

241.    The Defendants' actions were of such an egregious nature as to warrant the application of punitive damages.

WHEREFORE, Plaintiff requests that the Court award him $5 million in compensatory damages, and $1 million in punitive damages, plus his attorneys' fees and costs, for damages arising out of the unconstitutional retaliation against him.

**COUNT NINE**
**(Violation of Civil Rights Under Color of Law – 42 U.S.C. §1983)**
**(Against Hays and Snellbaker individually)**

242.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

243.    Hays refused to discipline Lombrana and Holman for their improper actions against Nett, refused to direct Nett's reinstatement, refused to certify that the relief ordered by the Panel was consistent with the Grievance Policy, and otherwise acted in concert with Rayner, Stought, Wright and others to discipline and eventually terminate Nett due to his political speech and deny him his due process rights.

244.    Snellbacker, as Director of Human Resources, first tried to improperly sneak a provision into the Employee Handbook which would have prevented Town employees from holding positions on the Town Council, and then supported the various steps and actions in the disciplinary process used against Nett, in order to lead to Nett's discipline, termination, and denial of grievance rights.

245.    Hays and Snellbaker's actions were taken under color of law.

246.    The purpose of the actions taken against Nett were to deprive him of his rights to Free Speech under the First Amendment to the United States Constitution and to Due Process under the 14th Amendment to the United States Constitution.

247.    Due to the Defendants' actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

248.    The Defendants' actions were of such an egregious nature as to warrant the application of punitive damages.

WHEREFORE, Plaintiff requests that the Court award him $5 million in compensatory damages, and $1 million in punitive damages, plus his attorneys' fees and costs, for damages arising out of the unconstitutional retaliation against him.

**COUNT TEN**
**(Violation of Civil Rights Under Color of Law – 42 U.S.C. §1983)**
**(Against Anderson individually and in his Official Capacity)**

249.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

250.    Anderson supported the Rayner-Stought-Wright political slate.

251.    Anderson acted contrary to law, and sound public policy, and beyond the bounds of his authority when he offered legal opinions to the Town about Nett's alleged conflicts of interest, when the Town Attorney had already provided advice to the Town on those questions.

252.    Anderson acted rashly, unprofessionally, and without proper basis in accepting information about the flawed Tacha report and using it to place Nett on the Brady/Giglio list.

253.    Anderson placed Nett on the Brady/Giglio list at the request of Lombrana to support her efforts to terminate Nett.

254.    Anderson may have also acted out of his own political motivations as a resident of Purcellville and supporter of the Rayner-Stought-Wright political slate.

255.    Anderson's failure to conduct or insist upon a thorough, fair investigation of Nett before placing him on the Brady/Giglio list and his intentional decision to take action before Nett had exhausted his grievance rights, was so lacking in justification and support as to deny Anderson the immunity normally accorded to a prosecutor for such decisions.

256.    Anderson acted improperly when recused himself from the decision to certify that the relief afforded by the Panel Decision was in conformity with the Grievance Policy, for the alleged reason that he was conflicted due to his placement of Nett on the Brady/Giglio list, but then referred the matter to Olsen, who was acting as Special Prosecutor at Anderson's request (per Court appointment) against Nett, seemingly with the same conflict as to Nett.

257.    Anderson influenced Olsen's decision on the question of whether the relief afforded by the Panel Decision was in conformity with the Grievance Policy in order the try to direct the response and to prevent the conclusion of Nett's grievance process.

258.    Anderson acted under color of law when taking these actions and making these omissions.

43

259. The purpose of the actions taken against Nett were to deprive him of his rights to Free Speech under the First Amendment to the United States Constitution and to Due Process under the 14th Amendment to the United States Constitution.

260. Due to Anderson's actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

261. Anderson's actions were of such an egregious nature as to warrant the application of punitive damages.

WHEREFORE, Plaintiff requests that the Court award him $5 million in compensatory damages, and $1 million in punitive damages, plus his attorneys' fees and costs, for damages arising out of the unconstitutional retaliation against him.

**COUNT ELEVEN**
**(Defamation)**
**(Against Lombrana)**

262. Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

263. On or about February 24, 2025, Lombrana falsely reported to Anderson that Nett lied about his actions during the January 10 agenda-setting meeting and the January 29-30 VML conference and that Nett had abused the "directed patrol" rules in the first instance and sick leave policy in the second instance.

264. Lombrana made these statements with the intent to induce Anderson to place Nett on the Brady/Giglio list. Lombrana intended to use such placement as an additional ground for terminating Nett's employment.

265. On February 21, 2025, Lombrana sent an email to Jonathan Banberger and Kristi Shalton at the Virginia Department of Criminal Justice Services ("DCJS"), with a completed DC-1 form informing DCJS that Nett had been terminated or resigned "while such officer is the subject of a pending internal investigation involving serious misconduct as defined …." and "for an act committed while in the performance of or in relation to the officer's duties that compromises an officer's credibility, integrity, honesty."

266. Lombrana's email was false because (1) as of that date Nett had neither been terminated nor had he resigned, and (2) he had not committed serious misconduct or committed an act that compromised his credibility, integrity or honesty.

267. The report referenced Tacha's investigation and the issues that eventually became the grounds used to support Nett's termination.

268. Eventually, the remaining grievance documents were provided to DCJS.

269. DCJS decertified Nett as a police officer on December 2, 2025, based on the grievance records provided to it by Lombrana.

270. Nett appealed the decision and DCJS has stayed its consideration of the appeal pending the conclusion of Nett's grievance process.

271. Lombrana's false statements led to Anderson placing Nett on the Brady/Giglio list and to DCJS decertifying Nett as a police officer in Virginia.

272. Lombrana leaked the allegations contained in the advanced notice of discipline and Anderson's placement of Nett on the Brady/Giglio list to the Loudoun Times Mirror and Loudoun Now newspapers, which republished the false allegations in the editions of their papers for the week of February 25, 2025.

273.    Due to Lombrana's actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

274.    Lombrana's actions were of such an egregious nature as to warrant the application of punitive damages.

WHEREFORE, Plaintiff requests that the Court award him $1 million in compensatory damages, $350,000.00 in punitive damages, plus his attorneys' fees and costs, for damages arising out of the tortious actions against him.

## COUNT TWELVE
### (Tortious Interference with Business Expectancy)
### (Against Rayner, Wright, Stought, Lombrana, Hays, Snellbaker, Holman, and Anderson in their Individual Capacities)

275.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

276.    Nett had a reasonable expectancy of continued employment as a Town of Purcellville police officer.

277.    Rayner, Wright, Stought, Lombrana, Hays, Snellbaker, Holman, and Anderson interfered wrongfully in that expectancy by submitting false and misleading information to the Town including, but not limited to, misleading information about the January 10 agenda planning meeting, false information denying that Nett was sick during the January 29-30 VML conference, false information that Nett abused sick leave or was insubordinate, and false information that Nett committed acts that warranted his placement on the Brady/Giglio list, and his actual placement on that list.

278.    They further acted improperly to interfere with the grievance process and prevent the conclusion of that process, which would have reversed Nett's termination and reinstated him, with back pay and benefits.

279.    These individual defendants were motivated by individual, political and personal considerations in their actions; not by the reasonable exercise of their professional duties.

280.    The actions of the named defendants outlined in the preceding paragraphs caused the Town to terminate Nett's employment wrongfully and without support.

281.    Due to these defendants' actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

282.    These defendants' actions were of such an egregious nature as to warrant the application of punitive damages.

WHEREFORE, Plaintiff requests that the Court award him $3 million in compensatory damages, and $350,000.00 in punitive damages, plus his attorneys' fees and costs, for damages arising out of the tortious actions against him.

**COUNT THIRTEEN**
**(Statutory Conspiracy to Deprive Business Expectancy)**
**(Against Rayner, Wright, Stought, Lombrana, Holman, Hays, Snellbaker, Anderson in their Individual Capacities)**

283.    Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

284.    Rayner, Wright, Stought, Lombrana, Hays, Snellbaker, Holman, and Anderson acted in concert  to maliciously and willfully injure Nett's reputation and professional interests by submitting false and misleading information to the Town including, but not limited to, pursuing

incorrect claims that Nett was engaged in a conflict of interest, misleading information about the January 10 agenda meeting, false information denying that Nett was sick during the January 29-30 VML conference, false information that Nett abused sick leave or was insubordinate, and false information that Nett committed acts that warranted his placement on the Brady/Giglio list, and his actual placement on that list.

285. They further acted improperly to interfere with the grievance process and prevent the conclusion of that process, which would have reversed Nett's termination and reinstated him, with back pay and benefits.

286. These individual defendants were motivated by individual, political and personal considerations in their actions and not by the reasonable exercise of their professional duties.

287. The actions of the named defendants outlined in the preceding paragraphs caused the Town to terminate Nett's employment wrongfully and without support.

288. Va. Code § 18.2-500 provides for a cause of action for business conspiracy in such situations.

289. Due to these defendants' actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

290. Pursuant to statute, Plaintiff is entitled to treble damages for this statutory violation.

291. These defendants' actions were of such an egregious nature as to warrant the application of punitive damages.

292. Plaintiff is entitled to his attorneys' fees and costs pursuant to Va. Code § 18.2-500.

WHEREFORE, Plaintiff requests that the Court award him $3 million in compensatory damages, which when trebled comes to $9 million, and $350,000.00 in punitive damages, plus his attorneys' fees and costs, for damages arising out of the statutory actions against him.

**COUNT FOURTEEN**
**(Common Law Conspiracy to Deprive Business Expectancy)**
**(Against Rayner, Wright, Stought, Lombrana, Holman, Hays, Snellbaker, Anderson in their Individual Capacities)**

293. Plaintiff incorporates by reference the factual allegations set forth in the preceding paragraphs, as if fully set forth herein.

294. Rayner, Wright, Stought, Lombrana, Hays, Snellbaker, Holman, and Anderson acted in concert to maliciously and willfully injure Nett's reputation and professional interests, thereby committing the tort of tortious interference with business expectancy, by submitting false and misleading information to the Town including, but not limited to, pursuing incorrect claims that Nett was engaged in a conflict of interest; misleading information about the January 10 agenda meeting; false information denying that Nett was sick during the January 29-30 VML conference; false information that Nett abused sick leave or was insubordinate; and false information that Nett committed acts that warranted his placement on the Brady/Giglio list, and his actual placement on that list.

295. They further acted improperly to interfere with the grievance process and prevent the conclusion of that process, which would have reversed Nett's termination and reinstated him, with back pay and benefits.

296. These individual defendants were motivated by individual, political and personal considerations in their actions and not by the reasonable exercise of their professional duties.

297. The actions of the named defendants outlined in the preceding paragraphs caused the Town to terminate Nett's employment wrongfully and without support.

298.   The common law of Virginia recognizes a cause of action for common law conspiracy if two or more persons act in concert to commit a tort.

299.   Due to these defendants' actions, Plaintiff suffered, and continues to suffer, wage loss, future wage loss, future pension loss, loss of professional and personal reputation, severe emotional distress, disruption of personal friendships and relationships, medical expenses, embarrassment, shame, humiliation, loss of self-esteem, and heightened anxiety.

300.   These defendants' actions were of such an egregious nature as to warrant the application of punitive damages.

WHEREFORE, Plaintiff requests that the Court award him $3 million in compensatory damages, and $350,000.00 in punitive damages for damages arising out of the common law conspiracy against him.

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiff, Carl Benjamin "Ben" Nett, demands judgment against the defendants, Town of Purcellville, Erin Rayner, Caleb Stought, Kevin Wright, Sara Lombrana, Michael Holman, Diana Hays, LaDonna Snellbaker, and R.D. "Bob" Anderson, as follows:

(a)   For the violation of his Due Process rights by the Town of Purcellville (Count One), Plaintiff requests that the Town's termination of him be overturned and he be afforded due process to contest his termination, which requires implementation of the Panel Decision. Plaintiff further requests that he be awarded $1 million in damages for the Town's violation of his rights, plus an award of attorneys' fees.

(b)   For the Deprivation of Liberty Interests without due process in violation of the 14th Amendment by the Town of Purcellville (Count Two), $5 million in damages, plus costs and attorneys' fees.

50

(c)      To correct the deprivation of state due process rights by the Town of Purcellville (Count Three), Plaintiff requests that the Court issue an order declaring that the relief granted by the Panel Decision was, in fact, consistent with Town Policy, and order the Town to implement the Decision. Alternatively, Plaintiff requests that this matter be remanded to the Town Manager with an order directing that the Town Manager answer the question of whether the relief granted by the panel was consistent with Town Policy, that the answer be directed to be in the affirmative, and that the Decision be implemented.

(d)      For Breach of Contract against the Town of Purcellville (Count Four), Plaintiff's requests that the Court award him specific performance of the contract and order the Town to accept the decision of the Panel. In the alternative, Nett requests that the Court award him $3 million in damages, both actual and consequential.

(e)      For Retaliation for the Exercise of First Amendment Rights (and Virginia Constitutional Rights) by the Town of Purcellville (Count Five), $5 million in compensatory damages, plus attorneys' fees and costs.

(f)      For Violation of Constitutional Rights Under Color of Law Through a Municipal Policy or Practice (Monell) by the Town of Purcellville, and by Rayner, Wright, Stought, Lombrana, Holman, Hays, and Snellbaker in their official capacities (Count Six), $5 million in compensatory damages, plus attorneys' fees and costs.

(g)      For Violations of Constitutional Rights under Color of Law by Rayner, Wright, Stought, Lombrana, Holman, Hays, and Snellbaker in their individual capacities (Counts Seven, Eight, and Nine), $5 million in compensatory damages, $1 million in punitive damages, plus attorneys' fees and costs.

(h)     For Violations of Constitutional Rights under Color of Law by Anderson (Count Ten), $5 million in compensatory damages, $1 million in punitive damages, plus attorneys' fees and costs.

(i)     For Defamation by Lombrana (Count Eleven), $1 million in compensatory damages and $350,000.00 in punitive damages.

(j)     For Tortious Interference with Business Expectancy by Rayner, Wright, Stought, Lombrana, Holman, Hays, Snellbaker, and Anderson (Count Twelve), $3 million in compensatory damages and $350,000.00 in punitive damages.

(k)     For Statutory Conspiracy to Interfere with Business Expectancy against Rayner, Wright, Stought, Lombrana, Holman, Hays, Snellbaker, and Anderson (Count Thirteen), $3 million in compensatory damages, trebled under statute to reach $9 million, and $350,000.00 against each defendant in punitive damages, plus attorneys' fees and costs.

(l)     For Common Law Conspiracy to Interfere with Business Expectancy against Rayner, Wright, Stought, Lombrana, Holman, Hays, Snellbaker, and Anderson (Count Fourteen), $3 million in compensatory damages and $350,000.00 against each defendant in punitive damages.

(m)     Attorneys' fees as applicable at a rate of $900 per hour, expected to total $1,000,000.00;

(n) Pre- and Post- Judgment Interest at the statutory rate;

(o) Plaintiff's costs of this action;

(p) And all other further relief that this Court deems just and proper.

### JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

Dated: January 28, 2026                          _____/s/ John C Cook_____
                                                 John C. Cook, VSB No. 38310
                                                 Cook Legal Solutions, PLLC
                                                 3975 University Drive, Suite 360
                                                 Fairfax, VA 22030
                                                 Ph. (703) 537-0023
                                                 Fax. (571) 520-9836
                                                 jcook@cooklegalsolutions.com

                                                 *Counsel for Plaintiff*